We're now hearing 17-1113. Would somebody please, thank you. 17-1113, Yaqua. Yaqua, Your Honor. Yaqua v. Western Range Association. Good morning, Your Honors. May it please the Court, David Seligman from Torts Justice for Plaintiffs' Appellants. There are two sets of claims that issue on appeal. I'll discuss the Sherman Act claims first and the Rico claims second. I'll try to aim to reserve about three to four minutes for rebuttal. Respecting the Sherman Act claims, Your Honors, plaintiffs have plausibly alleged, and we think the district court reasonably inferred, that the W.R.A. and the N.P.A.S., associations constituted by and controlled by competitor members, set wages for those competitor members by generating job offers with the wage terms set by the associations and not by the ranches. In case there was any doubt that the associations set wages for their — Let me ask you this. There's an overview of your Section 1 claim. Am I correct to understand that you're saying it's really a structural case, and the structure of these two organizations drive the behavior that constitutes the contract combination or conspiracy to fix prices? I think that's right, Your Honors. The structure of these organizations, these are joint ventures. They're membership associations constituted and controlled by their members, and actions that they take on behalf of their members are considered actions under Section 1. Is it a Section 1 conspiracy for one of the organizations, so is it W.R.A., to establish for a number of employees what their pay rate will be, minimal age, to a number of different ranchers? Is that a Section 1 violation? I think that is a Section 1 violation, and the Court should, I think, refer — Isn't that necessarily directed by the regulations on the H-2As? No, Your Honor. So the H-2A regulations permit the associations to help the ranchers fill out the paperwork, but nothing in the regulations permits the associations to set the wage across ranches. And if the question is whether the regulations, the H-2A regulations, permit the conduct at issue, we think that that analysis has to be run through the only test the Supreme Court has ever given us for determining whether Section 1, whether conduct that would otherwise be prohibited by the Sherman Antitrust Act, is permitted by other regulations. And that test is the test of clear repugnance. The Supreme Court has sat out again and again and again, most recently in the Credit Suisse case. And that test requires the Court to look — it's first a question of statutory or regulatory provision. Why do you use the word exemption? I mean, you're talking about an exemption. It just seems to be that this is conduct that's allowed, and this conduct that I thought was allowed, you say, is a Section 1 violation. In order for a regulation to permit conduct that Section 1 would otherwise prohibit, that regulation has to impliably repeal the Sherman Act with respect to that conduct. And in order for that to occur, it has to be clearly repugnant to the policies and the schemes of Section 1. And with respect to the question, Judge Murphy, that you raised about whether — about this being concerted action, I would look first to this Court's decision in the Gregory case. In Gregory, this Court explains that actions taken by an association on behalf of their members are concerted actions that meet the combination conspiracy and contract element of Section 1. There's, of course, a separate question. Well, they are sometimes. I mean, certainly Gregory didn't say that every trade association is acting illegally in every decision that they make on behalf of their horizontal competitors. Of course not. Well, there's always going to be a question. So first there's going to be the question about whether the trade association is acting in its own day-to-day operations. That's the first question. Right. And that's the distinction Gregory made, is, you know, they weren't doing business that was their day-to-day operations, but rather it seemed to be targeted against a particular prospective competitor at the rendezvous, right? That's right. In American Needle — Here, it's a little different. I mean, I think we have to look at Twombly. And the question for me is, what have you pled that is more than legal concerted action from which it is fair to infer a plausible conspiracy here? The — so our argument is that the concerted action here, the concerted action meaning the action taken by the association on behalf of their members, that that is not legal concerted action. It is concerted action. And then the next step would be whether it's a restraint of trade or a reasonable restraint of trade. That's the Gregory analysis. In pleading the concerted action, we've alleged with respect to the associations that the associations set wages on behalf of their members in the job offers. We've also alleged that the WRA and the NPAS both prepare form pre-employment contracts with set wages for shepherds in their home countries before they come to the United States, and that in the case of the WRA, requires shepherds to attest that they will work for the minimum wage in whatever state the WRA assigns them to work. Also from Ruiz, the Western District of Washington case, we also know that in at least some cases — But it is — it is true that if you pay the minimum wage set by the State legislature, you are acting legally. And as Twombly, they talk about the motivation of the horizontal telephone competitors, that there may not be any reason for them to pay more than that. In fact, it might be just logic that they all pay the minimum to these sheepherders. Absolutely, Judge McHugh. So first of all — So you have to plead something to take it out of just normal parallel action by independently acting competitors, right? Absolutely. And just being a member of the organization can't be enough, right? Correct. So what is it? Well, so in these cases, with respect to the ranches, the concerted action with respect to the associations is the action taken on behalf of their members. With respect to the ranches, the ranches have agreed with the associations, we allege, to allow the associations to set wages for them. That's no different. The associations are continuing membership associations constituted by the competitor members — the competitors of these ranches. So allowing an association to set prices or wages for you is no different, in our view, from allowing your competitors to set prices or wages for you. And that's no different — But are you saying if ranchers can allocate to the associations the recruitment and the hiring of their workers under Federal law, are you saying they can do that, but in so doing, they cannot put a salary into the agreements?  The essence of our claim is they cannot allocate to the associations decisions about that salary. Okay, but you agree that ranchers can lawfully allocate to the associations the recruitment and hiring of workers? Absolutely. The associations are permitted to play those roles. Okay. Then part of that is setting the terms and conditions of the hiring, isn't it? Nothing in the regulation says that. And in order to decide whether regulations permit conduct that the Sherman Act otherwise prohibits, we have to apply the clearly repugnant test, which means we have to read these regulations narrowly. Isn't a shepherd who enters into an agreement with an association — with a rancher through the association, that does not include the salary, if for some reason the shepherd wants to get out of that, all he has to do is say it's an illusory agreement because there's no agreement there's to pay. I think that's right. I think that the offers should include a salary. I think that the ranches, in the normal course of conduct and in the normal competitive market, the ranches would tell the associations what wage they wanted to offer. We allege that that's not happening here. That may be an issue at trial, but certainly on the allegations here, we plausibly allege that the association is making the decision about that wage. Let me try to understand this market. How do you think the market should work? Each rancher should say, I'm willing to pay $15 an hour, so get me some sheepherders from Mexico that will work for $15 an hour. Is that what you're suggesting? Without knowing more, that sounds like that could be a competitive labor market. Yes, Your Honor. Why would any rancher do that? That would mean that the rancher would first have to advertise locally in accordance with DOL regulations and say, I have positions for a sheepherder at $15 an hour and would not get anyone locally. No domestic workers are willing to do it at that price. So then they go abroad. Why would they do that when they can get plenty of workers, there apparently isn't a problem, at the state's minimum wage? Why suggest that the reason they're doing this is because of some conspiracy as opposed to just obvious economic concerns? Well, so first, Your Honor, the reasons that they're doing it, and this is fundamental to the Supreme Court's antitrust case law, if you look at Saucony vaccine, for example, the reasons that they're doing it are not relevant at this stage. What's relevant at this stage is that they're doing it through concerted action. The question here is whether you have alleged a plausible conspiracy as opposed to what it would be naturally reasonable independent action by each rancher. And I'm trying to understand why a rancher would do anything other than what they are allegedly conspiring to do. One reason would be that they should be competing over shepherd experience and shepherd skill, and they do compete over shepherd experience. How do you do that under this? How do you do that under the regulations? So there's a couple of really good shepherds, sheepherders, I'm told, not shepherds, in Mexico, and I'd like to get them. I'd have to pay them a premium price, but then I can't just do that for them. I have to advertise domestically, and if there's anyone in the United States who's willing to do it, then they're the people I would get. So I don't see how you should go about selecting someone special from another country. Well, and that gets into the intricacies of the H-2A program. I believe that what you would do then is you would open it up for interviews. You would advertise, and this is actually precisely what the H-2A regulations require. If you intend to pay that greater amount to a foreign shepherd with experience and skill, as it seems that they do in these cases, you have to offer that amount to the domestic shepherds. So you would offer it to the domestic shepherds. You would go through an interview process. You would see whether there was someone capable of doing the job, and then there are H-2A regulations. Why would you do that if you can get the people you need at a lower price? Well, one reason that you would do that is it's the law, right? No, no, no, no, no. You're running a business. You're running a ranch. You want to make the money you can, as much as you can. You want to make sure you have competent sheepherders working for you. Why go through all that hassle when you probably won't even get those two people in Mexico that are the absolute best sheepherders around? Well, one thing as a practical matter, I think in this case as we've pled, you know exactly who you want because they're already working for you, right? So the vast majority, and this is true of the plaintiffs in this case, the vast majority of the shepherds in this labor market continue to sign up for a year-long contract or a two-year-long contract or a year-long contract. So you know exactly what you intend to pay that person. You know what that person is worth to you. Between contracts, those skilled and experienced shepherds should be able to compete on an open market where people should bid for their skills. That's how a labor market works. Because if there's a domestic person who will do it, then the foreign worker can't get the job. At the very least, they'd be able to compete in an open market in that they'd be able to shop between ranches. Now, they can't really shop between ranches, even between contracts, with respect to the WRA because the WRA assigns them to a ranch, and with respect to all of the ranches because the wage offered in these wage terms generated through concerted action is precisely the same wage. This is not an open labor market. So if an associate at a law firm in his or her third or fourth year was quite skilled and quite experienced and quite valuable to the law firm, that associate should be able to shop between law firms for a higher salary. That's not happening here. In part of your hypothetical, let's take it a little further. Say that a particular rancher wants a person that's worked for them in the past from Peru, and they offer a price more than the minimum wage. They have to first go to the domestic market and offer that, correct? That's correct, Your Honor. All right. And if a domestic worker says, okay, can they say, well, you're not as qualified as the person I'm really looking to in Peru. Can they do that? I'm not sure that they can. That's a question about the HRA regulations that I don't know the answer to. I think that that depends on the facts. But, Your Honor, I'd like to reserve some time. I want to finish the answer. Sure, absolutely. But I think, again, the key question here, and I would look closely at the Gregory case in particular, which discusses the concerted action prong of Section 1. The key point here is that those wages, those offers, are made through concerted action. We plausibly allege that they're made through concerted action. That's enough to meet our burden at the 12B6 stage. Thank you, Your Honors. Thank you. Good morning. I'm Larry Stein. I have the privilege of representing Mountain Plain Service Agricultural Services. You want all three of you to argue something? You already saw how hard it is to even preserve time for yourself. Yes, Your Honor. I understand that's the risk of being first. We will try. But if we don't succeed, then I'll be here to answer the questions. To answer your first question about the domestic shepherd under the H-2A regulation, Your Honor, they have to hire the domestic. If there's a domestic and they don't hire it, they lose the slot under the H-2A regulations. They have no choice. The purpose of the H-2A regulations and DOL is to protect the domestic market and to set a price high enough so that the domestic worker is paid at least at the set market. It's not to pay for the Peruvian who works at a much lower price. It's to keep employers from offering too little below the domestic market is the H-2A. Well, what about the hypothetical I asked? The hypothetical where a domestic worker comes in and says he wants a job, you have to give him the job. And you lose the slot. Well, if I can pay the same price to – well, first of all, we're talking about a price that's above the minimum wage, a wage above the minimum wage. Correct. And you're telling me that if a domestic worker says, I'll accept that, you cannot hire a Peruvian shepherd who is more qualified. Correct. What's your authority with that? The regulations basically require that you hire domestic workers first, the H-2A regulations. You could put under the regulation, you could set certain qualifications such as three years' experience, things like that. They do. You do have to put it in your job order. If you could describe exactly this person. They do that in the H-1B one, but not in the H-2A regulations. Our job order basically requires six months or three months of shepherd experience. More experience is preferred, but that's in the job order. And it's an initial job order. It's advertised, as you'll note, locally, and it's published. The job offer is put through the Wagner-Peyser system through every unemployment office in the United States and the Commonwealth. Let me ask you this. In the absence of the DOL regulations, would it be a violation of the Sherman Act, Section 1, for these trade organizations to get together and agree that they will all pay the minimum wage allowed by state to the sheepherders? If they could plead that we got together and here's the agreement, it would be like the Shipowners Association. Well, you don't have to have proof of it. You don't have to have a listening device in the room and have the tape of it in order to plead a complaint. But you've got to plead a little bit more than our competitive economic interests. In other words, as we've noted. But before we get into what kind of evidence you need, answer my question. Like the shipowners, the courts have found that would be a Sherman violation if we sat down and published the schedule. Essentially, what you're arguing is that you're insulated from Section 1 liability because of the DOL regs.  Essentially, what I'm arguing, Your Honors, we didn't set the prices. The Department of Labor, and that's a critical dilemma. They set a minimum price. Right. They set a minimum price. But the difference between the shipowners and some of the other cases is the association set the wage prices and the conditions. So this is what we'll pay for this, and these are the conditions we will do. We didn't publish or set those wages. The Department of Labor goes through an analysis and, as you noted in the brief, sets a different wage rate for the states. So California has got $1,400, and Oregon's got $1,200, and Colorado's got $750, and Nevada's got $800. The critical difference between our case and that one is we start off with if a published wage list is by the Department of Labor, we don't go in and set it. But there's nothing to prevent an individual rancher who's in Nevada from saying, I'm going to pay my sheepherders $1,200 a month, not $800 a month, because I want the best I can get. There's nothing to prevent them from doing so. Okay. We didn't prevent them from doing so. So what the complaint is alleging is that you got together as a group and said, we're only going to pay the minimum required by law. They didn't do that factually, Your Honor. They did it by conclusions. They made a conclusion, and they used – if you look at the conclusion where they did this, they used a very broad conclusion and said, all the ranchers got together with all the associations, and they decided we would direct how to do it. And the court below addressed that very specific question and said it was a conclusion. And by its very general nature, it's a conclusion. There's no specific details. There's no fact. It's conclusory. There's got to be more. And the test is not whether it's direct evidence or whether it's circumstantial evidence. Right. It's whether the allegations are sufficient to push it over the line to a plausible claim of conspiracy, right? That is correct. And they have to show that there has to be some reason. If there's no rational economic motive for them to engage other than follow what the Department of Labor says, and there is none, why would a rancher in California want to conspire with a rancher in Colorado to let them undercut their market? They're at a competitive disadvantage. There's no economically rational reason for them to do that. Well, that doesn't get you over the hump. Within the state of Colorado, if you have multiple ranchers, then you're dealing with one minimum wage. So that helps you a little bit, but it doesn't get you over the hump. Well, the issue, though, is the factual pleadings that they've made are very narrow. Basically, when you really get down to it, they say that we make what is an initial job offer. It's advertised in paper in there, and we use the Department of Labor's offer. I didn't start. The offer is given by the associations to specific shepherds for specific ranches.  I'm sorry. Okay. When the association puts together these offers, do they make a specific offer to a specific, say, Peruvian shepherd for a specific ranch, or is it just a pool? It differs. Mountain Plains is an agent and deals with each rancher individually. Western Range, under the H-2E regulation, acts as a joint employer for their members in each particular state. So they don't. The offer goes out to the domestics first, and when the domestics don't apply for the jobs, and as the complaint noted, there are six domestic shepherds in the United States, then it can go to the individuals. Okay. Assume that there's a rancher in Colorado that has had a particular Peruvian shepherd in years gone by. Yes, sir. And can that rancher say, I want that shepherd? Once the paperwork has processed, and it's been approved by the Department of Labor, then an individual rancher can ask for an individual cheaper. But only after everything's been processed? Only after the wage you're going to pay that specific shepherd has been offered to everybody under the D-O-L regulation. That's correct. For domestic. I was saying shepherd, this rancher had had three years in the past, and he gets this shepherd again for the fourth year as minimum wage, but then gives that shepherd more because of his qualification. Yes, Your Honor. Can the rancher do that? Yes, Your Honor. Well, they're violating the regulations then because they did not make that offer available to domestic shepherds. No, Your Honor. Their job offer has to be for an initial job. And if a domestic person wants that initial job, they have to give it to the domestic, and I end up not being able to get it. At what point can you give the shepherd a raise? In Mountain Plains, our job offer says specifically that you can give raises. We would maintain in the job offer itself. But that sounds like what Judge Murphy is saying. That's an evasion of the D-O-L regulations. If you can say, oh, you really worked well your first day here, we're going to double your wage. If they did it on the first day, the answer to that question would be yes. Okay. But that's not the answer because it's an initial job offer. We're bringing in the people for the first time. The way it works is this offer is intended to protect domestic workers. So if I offer in Colorado $750 and a domestic worker wants it, even if I have a shepherded back that I've been using for four years, I lose the slot, period. But you're not telling me that if the Colorado rancher has had this same shepherd for three years in the past and right up front says, and in the group of shepherds, I want that guy. You're saying they don't. They can't. They can't. And Mountain Plains very specifically puts in their job offer that very statement. The problem is the offer that they're claiming doesn't contain any discretionary language. And in the very job offer that we're talking about, it says bonuses and or wages that are higher than the guaranteed wage rate may be offered at the employer's discretion. It's in the job offer. And this job offer has been approved by the Department of Labor. So it's not illegal to give people raises. It is not from a specific rancher to a specific shepherd. It cannot be until it passes the process of being approved for Peruvian farmland. So as a rancher, it's still pot luck whether I'm going to get this shepherd that I've had three years. If I get a domestic. If I get a domestic? Yes. You've got a partner. Yes, ma'am. But I'm going to ask him a question to start with. Does California get all the best shepherds? Much more. You know, that's not alleged in the complaint. So I don't know. We're here on a Twombly case. Yeah. And we're looking at the complaint. And I think, in fact, this case, and I shouldn't say I'm Ken Rossman. I represent two bar Nottingham, two Colorado ranches that are named as defendants. Sure. I represent two bar Nottingham, two Colorado ranches that are named as defendants. And I'd like to make a couple of points that are specific to the individual ranches that are named as defendants. First, I did want to address some of the questions that have come up. So this is a Twombly case. And this case actually is much more like Twombly than most cases that cite Twombly. Here we have allegations of parallel conduct, that the ranchers worked with an association and all offered the same price. And the court is being asked to infer that there has been an agreement among those ranchers and the associations to do this in order to hold prices down. And the court is faced, and the court below addressed this, and this court is faced with the question of whether the factual allegations show, in the context or setting of this case, that that plausibly leads to a conspiracy. Or, rather, if it's just that it could be just, well, independent action. Twombly says that if it could just as well be independent action, then it doesn't rise to the level of plausible conspiracy. And so the question here is, and the discussions here have been about context. Regulations. Well, that's context. Defendants aren't arguing in this case that the regulations somehow give us a strict immunity. We're arguing that the regulations are context that the court should look at that make these allegations of fact less suspicious. In addition, the wage rate that's being set by the federal government. The fact that there doesn't appear to be any reason to raise it is context that suggests that this is not a plausible conspiracy, but rather it's just independent action. And, in fact, to show a distinction is, if there had been no wage floor, the fact that everybody picked the same wage would be a concerning fact. But here we have context or a setting that shows that there is a reasonable reason to think that everybody would naturally set that wage. And so you don't have to infer that there is, in fact, an agreement among hundreds of branches to do this. But rather, it's rational for them to do it independently. Well, your clients, though, could make a generalized offer at more than the minimum wage for Colorado and then take the risk that no domestic shepherd would accept it. Well, they could, but there's no fact alleged that shows that they can't get plenty of people in Peru for seven hundred fifty dollars a month. And so it is natural to assume. You agree that the shepherds from Peru show up year after year after year. And so there is an experience factor here by individual ranchers so that they want a specific shepherd. I do agree with that. And I agree that what happens once you have that situation is not alleged in the complaint. And so, frankly, we in the court are stuck looking at the facts alleged in the complaint, which focuses on the initial job offers. Wow. But that's it's only minutely different than one of the allegations. And it may be in the third complaint. I don't remember that somebody got from Peru got a higher wage than the minimum. I think there's there's there's an allegation that of the two thousand job offers that went out, one job offer was for higher than the minimum wage. Your Honor, there is an allegation that there was one which shows it can be done. But it doesn't disturb the context that it makes sense that if you can get sufficient workers and workers who satisfy your needs at a lower price, you don't need to conspire to avoid raising the price. So it's just as well independent action. Now, I did want to quickly talk about a couple of things that relate specifically to the ranchers. First, you can't be part of a conspiracy if you don't know it exists. And here there are no factual allegations that show that these independent ranchers actually knew what other ranchers were doing. And so not only do they have to show that there's a possible conspiracy here, but they have to plausibly show that the individual ranchers were each members of that conspiracy. And here the allegations don't know the same price. They don't allege that they all know this the same price. They don't let any facts to show how this was shared among. This is the biggest distinction. That's like trying to get a kid. The minimum prices are published. Well, they know that they know that their neighbor and rancher. Well, assuming it were they to have alleged that they talked to their neighbor ranchers, that would be one way to try to show this. But they didn't allege that. But we know that it has to be published. Well, it has to be published in unemployment offices around the country. And so, yes, under federal regulations. So conceivably ranchers to go and try to figure out what other ranchers were offering through by looking at the federal government, any single unemployment office and know what every rancher in the country is offering. And again, that's not alleged. And in fact, that's the biggest distinction between the association cases that are cited in our case. And all those other cases, there are rules or handbooks or regulations that make it clear that, of course, all the association members knew what was going on. Quickly list your other things and we'll see how much. Oh, I was going to talk quickly about group pleading and the fact that the ranchers are not fungible here. And the allegations lump them all together. And then they don't ignore the differences, say, that the courts already explored between one association and the other. And finally, the two bar is not even listed as a rancher defendant. And so two bar has no allegations against it at all. And so we'd ask the court to affirm as to them. Who can I ask a question about Rico? Well, you may not be happy to get this question. So one of the claims, one of the Rico claims is that Richard is the person who is associated with an enterprise. Why does that not satisfy the centric Kushner case? Why? You devoted one sentence to that in your brief, and I thought that was clever. So maybe we wouldn't notice. You got us. You included in the board. So I don't understand how you can. You may have a perfectly good defense to that claim, but not the defense. So as it relates to that, ultimately, this is distinct. Is there a distinction between the person defendant and the enterprise? Right. In their second amended complaint, it's purely the associations or their membership, which yellow bus and related progeny do not allow, or in the case of richens, it's richens and W.R.A., which also is not permitted under Cedric Kushner. And W.R.A. as the person, and W.R.A. as the association, but can't we read that as richens? I mean, encompassing that is that richens is the person, and he's associated with W.R.A. as the enterprise, and it seems to me under Kushner that there's sufficient distinction. So if you have under Kushner, if you have a defendant who is misusing an organization, and that was the allegation in Kushner or King. And here. The allegation here ultimately is two points. One, in their appellate brief, they state there is no substantive difference between the RICO claim against richens in the second amended complaint and in the third amended complaint. If that's true, and there's no substantive difference as it relates to richens between the SAC and the TAC, then it's nonsensical. They're making a procedural point where the reality is the RICO case law requires a difference for a substantive reason. You have to have a purpose with an association in fact. You have to have longevity. You have to have relationships. Their admission in their appellate brief torpedoes the richens' claim. But if, as I think Your Honor is asking, if W.R.A. is not a defendant for RICO, and the only defendant is richens standing alone, can they allege a RICO claim is against richens misusing W.R.A.? Okay. Thank you, Judge McHugh. The point there, I think, is this. They don't allege that richens acted outside the scope of his agency at all versus King. Well, they didn't know. In King, they said King, Mr. King was working within the scope of his position with King Enterprises promoting boxing fights. The difference there is King was actually the owner. So Cedric Kushner in King is he's the owner of the organization. Here we have an employee, director, but ultimately an employee of the organization acting on behalf of the organization and performing his duties consistent with the organization's duties. Well, the allegation is that Mr. Richens, as the director, used W.R.A. for the benefit of himself by fixing the wages at the minimum. Right? I mean, that's the allegation. And at this point, all we're trying to see is if it raises its applause, if it's stated a claim. I think as Magistrate Judge Schaefer set forth in his 43-page opinion, ultimately the purpose described in their complaint is the purpose of W.R.A., putting together H-2A applications and job offers. That itself is not a violation of RICO. I'll note, however, that the Richens solo enterprise appears only in the third amended complaint. No, not Richens enterprise. Oh, okay. Where it's Richens as the defendant, W.R.A. as the enterprise. Right? That's only a third amended complaint claim. And for the reasons that both Magistrate Judge Schaefer and Judge Blackburn held in the lower court, we don't get to the third amended complaint. We don't. Okay. So my question was based only on the allegations in the third complaint. There's no allegation that Richens is the person in the complaints that were allowed by the court? In the second amended complaint, it's Richens and W.R.A. is the person. Okay. So it's only the third amended complaint where you have Richens. And for the reasons described by the judges in our appellate briefs, I'm happy to talk about it, but the third amended complaint is futile in terms of timeliness. We're way outside the scope. Okay. Thank you. Wait, is it sure? Yes. I'm assuming you're qualified to answer an antitrust question, too. That I am qualified to answer. Well, I can certainly do my best, Your Honor. If these ranchers had knowledge, they didn't enter into an agreement that everybody wanted to have the minimum wage, but if they knew that that was going to be the effect, is that a price fix and is it a conspiracy? Your Honor, having knowledge that your competitors are paying the minimum wage and that is, in fact, bringing in the, in this case, Peruvian sheepherders, that's not enough for an agreement. That's the consciousness part? Is that what you're saying? Of conscious parallelism? Yes. You need to have, it's the plus factor, right? You have to have either an agreement or some other plus factor. In the case of Beltran, for instance, you had some admissions, but you can't just have knowledge that people are. . . The reason why I asked you is because I thought one of your colleagues was saying that was enough if it was knowledge. Thank you. Thank you, Your Honor. You're going to get some more time. Quite a bit, actually. No, I think you'll get quite a bit of time. We'll start with five minutes because I don't think there's that much new stuff that you didn't really face before, but I'll give you five. Absolutely, Your Honor. So a couple of points. First, and Judge Murphy, I think you picked up on this in my friend's arguments, part of the allegations here, and I believe that this was certainly alleged in the third amendment complaint, this part of the briefing out in the second amendment complaint, is that the ranches here, although they're continually offering the minimum amount, they pay more, especially to experienced shepherds. Is that, instead of being an antitrust violation, is that just merely a subterfuge? Is it they're really mucking around with these regulations? Well, it could also be that. I think that it makes the conscious commitment of the ranchers even more plausible, and that's for a few reasons. First of all, you minimize the risk of being held to account for violating regulations if your friends are all doing the same. I'm much more likely to jaywalk with a group than I am alone. And two, there are unique benefits that come from engaging in this conduct conservatively that don't come when you engage in it individually. And one of those benefits is that you're able to maintain what we call the cartelized wage. You're able to maintain that offered wage at the minimum. And again, Judge Posner's, I think, decision is really helpful in the high-fructose corn syrup case in pointing out how that wage will continue to manipulate prices. And then lastly, engaging in this conservative action allowed the ranchers, over the course of decades, to suppress the minimum wage rate set by the Department of Labor, as the Department of Labor explains what it did continually over decades in determining the minimum wage was to look out at the job boards, look out at the H-2A applications to see what people were being paid. And when they saw it through what I think we allege in retrospect was conservative action. I didn't think it was DOL that set the minimum wage. I thought it reported what the states individually said is their minimum wage. Some states set higher minimum wages, but the Department of Labor sets the adverse effects. The 750? The 750, Your Honor. But they looked out at what was happening in order to see what the minimum wage rate should be. With respect to the conservative action requirement, the agreement requirement, a few things to point out here. Actually, before I go there, very briefly, Mr. Stein, in his argument, identified that some of the MPAS job offers include the possibility of bonuses. First of all, we should be clear, that's only the MPAS job offers. None of the WRA job offers do that. And even still, that doesn't change the fact that it's the association setting the minimum wage rate and allowing maybe for departures above it, but that's the same as an association setting a list wage. Additionally, we actually don't think that that complies with the requirements of the H-2A regulations, allowing for the possibility of bonuses, not what the H-2A regulations contemplate. We have actually one of the plaintiffs in this case is a very capable, very experienced domestic shepherd who would happily take a job if ranchers advertised the true going rate. But you're not asserting a private right of action for violation of the REC, right? No. We're saying that those violations happen conservatively, and that the fact that the violations happen makes the conscious commitment of the ranches more plausible. One of the things in Twombly that the Court focused on was the historical backdrop for what was happening at that time between these telephone groups, because when they had broken up the monopoly and they had their own territories. Here, I mean, one of the things that I've wondered about is, do we know what was happening before these trade associations were formed? Were the ranchers all still paying, offering the lowest amount allowed by law? Do we have any idea? I'm not sure we know what was happening before the trade associations were formed. We know what happens. Do we have pretty important information in terms of whether we have a conspiracy or just people acting in their independent economic interest? Well, Your Honor, we do know what happens outside of the trade associations. So, for example, we know that in North Dakota and Texas, shepherds make $10 to $12 an hour, right? So that gives us some pretty good indication. I think that that's a question to damage, as that goes to damages and not to liability. But, again, there's a fundamental distinction between this case and Twombly. In Twombly, what the plaintiffs alleged was multiple in parallel actions, so entities acting in parallel. Here, what we're alleging is that these job offers and the wage terms in those job offers are filled in by the associations. That's the concerted action. That's the critical difference between this case and Twombly. Twombly was about whether allegations of individuals acting in the marketplace, whether there was sufficient circumstantial evidence to suggest that those individual actions were, in fact, concerted actions. In this case, what we allege is concerted action. We allege that the associations are the entities that are setting those wage terms. That's sufficient, at least under the first part of the Section 1 test. So one of my friends on the other side said that this case might be different if we'd alleged that the ranches had gotten together, talked to their neighbors, and said, Hey, are you offering the minimum wage? I'll do the same if you do. We actually allege we think something stronger than that. What we allege is that the ranches said, I will give the responsibility to set wages to my neighbors, because my neighbors are the associations. That's the agreement. The agreement is, I'm going to, as an individual ranch, I'm going to allow the associations to set wages for me. That is no different from going around to all of your members, going around to your neighbors, and asking your neighbors to set wages for you. These associations are joint ventures constituted and controlled by neighbors, and they're the ones setting the wages for you. That seems to me to be right at the core of what Section 1 prohibits, and we think the Anderson case is precisely on point. Now, another argument that they make throughout their briefing, and they've made a little bit here today, is that the difference between some of these cases and this case is that there's no rule here. There's no requirement. We think that what rules are in these association cases is that they're a way of affecting the concerted action, because in cases where the individual members of the association are acting individually, in this case there's no need to have a written rule because the association is doing the action for them. The association is filling in the wage term. There's no need to have a rule there. It's like the NFL case. There was no need in the NFL case for the NFL to say you shall be a member of this joint license. The NFL PA entered into the license on behalf of the teams, and the NFL PA was a joint venture. Sure, absolutely. There's a point that I wanted to make about RICO. So if you look at the second amended complaint, count four of the second amended complaint. This is page 50. Appendix 71 clearly states that that claim is made against both defendant WRA and against defendant Richens, and it refers to the Richens enterprise and the WRA enterprise separately. In the complaint, we define the Richens enterprise and the WRA enterprise separately. This is just a record thing. The allegation about the bonus paid or the higher the minimum wage, wasn't that first alleged in the third amended complaint? It was certainly in the briefing before the court by the defendants, actually. So the defendants raised it in their briefing in the second amended complaint, I believe. So it was before the court when the court was addressing the second amended complaint. That the MPAS allowed for the possibility of bonuses. In the attachments to the second amended complaint, we include MPAS job orders, and as Mr. Stein suggested, many of those job orders do allow for the possibility that ranchers may offer a bonus. Again, not the WRA job orders. The question I'm harking to is there was a specific reference to a particular shepherd who got more. Where did that come from? I'm not sure where that came from, Your Honor. I think that the job orders and the H-2A applications attached to the second amended complaint and attached to the third amended complaint, I believe, uniformly offer, and again, this is the associations offering the minimum wage with, in some cases, the MPAS allowing for the possibility of a bonus. Can I have a recall question? Yes. What are the allegations in the second amended complaint, and I'm focusing on that because you say that the third amended complaint says nothing more than the second amended complaint does. So in the second amended complaint, what allegations assert that Richens used WRA to achieve his purposes, as opposed to WRA using Richens to achieve its purposes? There are several allegations in the complaint, in the second amended complaint, regarding Richens' conduct as the executive director of the WRA, filling out the H-2A applications and the job orders that include the alleged misrepresentations. And again, to Judge McHugh's point earlier, but the misrepresentations, which do not have to do with the antitrust claims here, there are several allegations that he was the person filling out those applications and filling them out and making the misrepresentations. There's also allegations that he is a rancher and individually benefiting in that capacity as well.